# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **TOMMY DALE ADAMS #498591,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **NO. 3:20-cv-00551** |
| **v.** | ) | |
| | ) | **JUDGE CAMPBELL** |
| **GRADY PERRY, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM

Petitioner Tommy Dale Adams filed a pro se petition under 28 U.S.C. § 2254 for a writ of habeas corpus (Doc. No. 1) and Respondent filed an Answer. (Doc. No. 7). For the following reasons, Petitioner is not entitled to relief under Section 2254 and this case will be **DISMISSED**.

## I. PROCEDURAL BACKGROUND

A Wilson County jury convicted Petitioner of first-degree felony murder, second-degree murder, and especially aggravated robbery for killing and robbing Darrell Sloan. Petitioner received a life sentence. The Tennessee Court of Criminal Appeals (TCCA) affirmed,[1] and the Tennessee Supreme Court denied Petitioner's application for permission to appeal. *State v. Adams*, No. M2013-01080-CCA-R3CD, 2014 WL 3565987 (Tenn. Crim. App. July 21, 2014); (Doc. No. 6-14). Petitioner then filed a post-conviction petition, and the court denied it.[2] The TCCA affirmed, and the Tennessee Supreme Court denied discretionary review. *Adams v. State*, No. M2018-00470-CCA-R3-PC, 2019 WL 6999719 (Tenn. Crim. App. Dec. 20, 2019); (Doc. No. 6-26).

---

[1] The TCCA remanded for the limited purpose of entering corrected judgments to reflect the merging of the murder convictions, leaving Petitioner's effective sentence intact.

[2] The court dismissed Petitioner's initial petition on preliminary review, but the TCCA remanded for appointment of counsel and further proceedings. (Doc. No. 6-15 at 15–21). Counsel eventually filed a second amended petition, and the court held an evidentiary hearing before denying relief. (*Id.* at 83–165).

## II. FACTUAL BACKGROUND

On post-conviction appeal, the TCCA provided the following summary of trial evidence:

At the trial, Eddie Good testified that on October 3, 2009, Mr. Good hosted a bonfire with the victim, who was visiting Mr. Good for the weekend, and some other friends when the Petitioner, Derrick Blair, Chris Estes, and Chris Cozart arrived uninvited. Mr. Good had been expecting Mr. Blair to stop by and pick up money Mr. Good owed him, but he did not expect Mr. Blair to be accompanied. The victim had "passed out" inside the house in a chair in the "pool room," and after some time, Mr. Good asked everyone to leave. Mr. Good acknowledged that he had a "good buzz" from drinking alcohol, smoking marijuana, and consuming a hydrocodone pill. The group of men with Mr. Blair crashed their truck on the way out of Mr. Good's property and borrowed Mr. Good's truck to tow their truck. When that failed, Mr. Cozart and Mr. Estes left in Mr. Good's truck to retrieve a larger truck. The Petitioner and Mr. Blair remained. The men did not return Mr. Good's truck, and although Mr. Good did not recall having argued with them, he remembered "coming to" and sitting by the bonfire with his gun beside him.

Mr. Good saw a truck come up the driveway, and three people exited and walked toward the house. One person looked through a window; another looked through the kitchen window from the porch; and a third person looked through the porch door. Mr. Good yelled at the people and fired two rounds in the air. The "smallest of the three" people fired back at him. He opined that the gun fired in his direction sounded like a .22-caliber gun because it "didn't sound that loud." Mr. Good entered the house and fell asleep in his bedroom, and when he awoke, he discovered the victim's body in the pool room. Mr. Good called his mother, who called the police, and Mr. Good waited on the porch for the police to arrive. Mr. Good's truck was found one week later in a creek bed. Mr. Good had "a scuff mark" on his face "where it appeared that someone had hit him with something," but he did not remember being in a fight.

Jody Hayes, one of the bonfire guests, testified that around 9:00 p.m., the Petitioner and his group arrived and went inside the house, that Mr. Good did not appear to be "overly intoxicated," and that at some point, Mr. Good asked everyone to leave. She stated that the four men returned when their truck became stuck, that she refused to let the men use her truck, and that Mr. Good gave them the keys to his truck. Ms. Hayes saw the victim asleep in a chair in the house and "wiggled" him twice throughout the evening in an attempt to rouse him, but he did not stir. Mr. Good allowed two of the men to drive his truck offsite, and Ms. Hayes left the property around midnight. Mr. Good called Ms. Hayes the following afternoon and did not mention that the victim had been killed.

Chris Cozart testified that after spending time with Mr. Blair, Mr. Estes, and the Petitioner in the afternoon, they went to Mr. Good's house because Mr. Blair needed to collect money from him. The men saw that Mr. Good was having a party,

2

drove up to the house, and entered. Mr. Cozart recalled seeing the victim playing pool inside. After about one hour, Mr. Good asked everyone to leave. When Mr. Cozart left the house, the victim was awake, alert, and seated in a chair in the corner of the pool room.

Mr. Cozart testified that Mr. Estes drove his truck into some trees, and after they were unable to tow the truck with Mr. Good's truck, Mr. Cozart and Mr. Estes drove to the Petitioner's house to retrieve Mr. Cozart's truck. Mr. Estes wrecked Mr. Good's truck, and Mr. Cozart was "not in good shape" after the accident. The two men walked the rest of the way to the Petitioner's house, and although Mr. Cozart's memory of events was not clear after that, he remembered riding with Mr. Estes back to Mr. Good's house, retrieving Mr. Estes's truck, and returning to the Petitioner's house. Mr. Cozart fell asleep on the Petitioner's couch. When he awoke, the other three men were asleep near him, and Mr. Cozart asked Mr. Estes for the keys to Mr. Cozart's truck. Mr. Estes told him the truck was "messed up," and the truck had "fresh dents, blue paint on the bumper, and a blown-out tire."

Mr. Blair testified that he pled guilty to the second-degree murder and aggravated robbery of the victim. His version of events was similar to that of Mr. Cozart. Mr. Blair drank beer, smoked marijuana, and took Xanax at the Petitioner's house. After Mr. Estes had wrecked his truck, Mr. Good approached Mr. Blair and the Petitioner "and began screaming that Mr. Estes had stolen Mr. Good's truck." Mr. Good threatened to kill them, and Mr. Blair and the Petitioner ran to the roadway, where they encountered Mr. Estes and Mr. Cozart in Mr. Cozart's truck. The four men returned to Mr. Good's house to retrieve Mr. Estes's truck, and then they went to the Petitioner's house and continued to drink alcohol and smoke marijuana. Later, the Petitioner stated that he wanted to return to Mr. Good's house and "kick his a--" for threatening them, and the group, minus Mr. Cozart who was asleep, drove to Mr. Good's house in the Petitioner's car. The Petitioner brought a .410-caliber shotgun and a .22-caliber pistol. The Petitioner carried the shotgun, and Mr. Estes carried the pistol. The Petitioner fired a shot into the air and reloaded the shotgun while he ran toward the back door of the house. The Petitioner ran into the house; Mr. Blair went to the back window; and Mr. Estes shot through the back door of the house twice. Mr. Estes handed the pistol to Mr. Blair, who shot through the window four times. The Petitioner ran into the pool room, turned to the right, and fired a shot. Mr. Blair saw the victim leaning over the pool table with blood on him. The Petitioner went out the back door of the house, opened the screen door, and "stuck the gun in there and shot again." Mr. Blair stated that the additional shot hit the victim. Mr. Blair went inside and saw the victim lying on the floor.

Mr. Blair took the victim's wallet from his back pocket, thereby ripping the victim's pants. The three men looked for Mr. Good inside the house but did not find him. Mr. Blair gave the victim's wallet to the Petitioner and Mr. Estes when they reentered the Petitioner's car. The men went back to the Petitioner's house, where the victim's wallet was thrown into a fire. Mr. Blair did not know what happened to the money in the wallet. The men continued drinking alcohol, smoking

marijuana, and "snort[ing]" Xanax pills. At some point after the shooting, the three men pulled Mr. Good's truck off an embankment and to a creek behind the Petitioner's house.

The three men again returned to Mr. Good's house in Mr. Cozart's truck because the Petitioner said they needed to find Mr. Good. Mr. Blair had the pistol in his waistband, and the shotgun was inside the Petitioner's car. As they approached the house, someone yelled at them and began shooting at them. Mr. Blair fired the pistol at the person; the men left; and Mr. Estes drove them to the Petitioner's house, where Mr. Blair fell asleep. Mr. Cozart's truck had a flat tire from the shooting. In spite of Mr. Estes's admonition not to tell anyone what had happened, Mr. Blair spoke to the police early the next morning and on subsequent multiple occasions. Mr. Blair stated that although he gave multiple inconsistent statements, he was truthful the last time he spoke to the police, and he was certain the Petitioner shot the victim. Mr. Blair noted that on an occasion before the shooting, he stole the Petitioner's .22-caliber pistol and sold it to an individual from whom the Petitioner eventually bought it back.

Mr. Estes testified that he had been charged with the first-degree felony murder, second-degree murder, and especially aggravated robbery of the victim. He had no agreement with the State in exchange for his testimony. Mr. Estes's testimony regarding the sequence of events was similar to that of Mr. Blair and Mr. Cozart. Mr. Estes stated that when the four men first entered Mr. Good's house, he saw the victim asleep in a chair in the pool room. Mr. Estes acknowledged that he wrecked his own truck and later, Mr. Good's truck. Both Mr. Estes and Mr. Cozart were injured in the accident involving Mr. Good's truck. As Mr. Estes and Mr. Cozart drove back to Mr. Good's house in Mr. Cozart's truck, the Petitioner and Mr. Blair ran onto the road outside Mr. Good's driveway and told Mr. Estes that they had to leave because Mr. Good had "threatened him because Mr. Estes had not brought Mr. Good's truck back." After the men retrieved Mr. Estes's truck, they returned to the Petitioner's house, Mr. Cozart passed out inside, and after an interval in which Mr. Estes fell asleep, Mr. Blair woke him up. Mr. Estes was intoxicated "to the passing out point" and followed Mr. Blair and the Petitioner to the Petitioner's car. The Petitioner was carrying "stuff in his hands," and Mr. Estes saw a sawed-off .410 shotgun and a "pistol, revolver" in the car, both of which he knew belonged to the Petitioner. The shotgun was in the front seat, and Mr. Blair had the pistol in the backseat. Mr. Blair told Mr. Estes that they were going back to Mr. Good's house to "rob them."

When they arrived, the Petitioner ran to the door near the pool room, and Mr. Blair ran to the pool room window. The Petitioner ran in the door, shot the shotgun toward the chair where the victim had been sitting previously, and ran back out. Mr. Estes heard the victim moaning in pain. The Petitioner and Mr. Blair spoke, but Mr. Estes did not hear what they said. Mr. Estes saw a "shadow like someone getting up" in the pool room, and Mr. Blair fired the pistol through the window four times. Mr. Estes saw the victim walk slowly to the door, turn, and slide down the

4

door. The Petitioner "opened the door and put the gun in there and leaned back out and pulled the trigger and shot." Mr. Blair and the Petitioner ran back in the house, and Mr. Blair leaned over the victim. Mr. Estes did not enter the house to see what was in the pool room.

The three men got into the Petitioner's car, and the Petitioner and Mr. Blair ran back into the house a second time, citing the need to find Mr. Good. They returned; the Petitioner placed the shotgun between the front seats; and Mr. Blair passed the Petitioner a wallet. The Petitioner threatened to kill Mr. Estes and Mr. Blair if they "told on him." Once they were at the Petitioner's house, the Petitioner and Mr. Blair discussed building a fire, but Mr. Estes did not see a fire. After sitting on the couch for about fifteen minutes, the Petitioner said that they needed to retrieve Mr. Good's truck "because of what had happened" and noted that Mr. Estes's fingerprints would be in the truck. The Petitioner stated that if Mr. Estes "didn't want to go to jail [they] needed to get rid of the truck." Mr. Blair and Mr. Estes towed Mr. Good's truck to a creek behind the Petitioner's house and pushed it in.

After they had returned to the Petitioner's house, the Petitioner walked out the back door with the shotgun and pistol and said they needed to find Mr. Good. Mr. Estes drove the three men back to Mr. Good's house in Mr. Cozart's truck. Mr. Estes pulled around behind the house, and as he turned the truck around, he "ran over a TV that was laying in [the] yard and the tire started going flat." Mr. Blair and the Petitioner ran toward the house, and Mr. Estes heard someone yell at them to leave. Mr. Estes heard two "sharp loud rifle shots" from Mr. Good at the bonfire, and "three sharp pistol sounds and a .410 blast" from the Petitioner and Mr. Blair. The three men hurriedly left and returned to the Petitioner's house around 4:30 a.m. Mr. Estes fell asleep on the couch for about one hour before Mr. Cozart awakened him by asking for his truck keys. Mr. Estes informed Mr. Cozart of the flat tire and told Mr. Cozart that Mr. Cozart "was drunk and got up in the middle of the night and drove around . . . then he c[a]me back."

Mr. Estes gave three police statements beginning on the evening of October 4, 2009, in which he gave increasing amounts of information about the evening's events. The last statement included "everything that happened." He told the police that his fingerprints would be on the pistol's barrel because he handed the gun from Mr. Blair to the Petitioner in the Petitioner's car but that he did not possess the pistol at Mr. Good's house.

Wilson County Sheriff's Deputy Scott Filson testified that he responded to Mr. Good's house the morning of October 4, 2009, and spoke to Mr. Good on his front porch. Mr. Good indicated that the victim, who was deceased, was inside the house. Deputy Filson noted that the victim's body was in the pool room.

Detective Jeff Johnson collected the following physical evidence from the scene: "spent .410 shotgun shells outside the pool room door; wadding from .410 shotgun shells in the backyard and inside the pool room . . . and three spent .22-caliber shell

5

casings near the fire pit[,]" a small piece of cotton type material, and Mr. Good's .22-caliber rifle. He also photographed the victim's body and ripped rear pants pocket, as well as the crime scene generally. He sent the physical items to be tested by the Tennessee Bureau of Investigation (TBI) laboratory.

TBI Special Agent Chet Mason testified that he responded to Mr. Good's house, spoke with Mr. Good, and determined that Mr. Blair was a potential suspect. When Special Agent Mason interviewed Mr. Blair the following day, Mr. Blair showed him a pair of blue jeans with blood on them, confessed to "being a party to the victim's murder," and implicated the Petitioner and Mr. Estes. Special Agent Mason obtained a search warrant for the Petitioner's house, which was executed on October 5 when the Petitioner was not at home. A spent .410 shotgun shell was found near the front sidewalk, two pieces of shotgun wadding were found in the front yard, and two unfired .410 shells were found underneath the couch. The Petitioner was found at another location, and he and his car were taken to his house. On October 7, Special Agent Mason returned to search the fire pit at the Petitioner's house, and the Petitioner signed a "TBI waiver of constitutional rights to a search warrant." Special Agent Mason recovered burned pieces of the victim's voter registration card and insurance card, four .410 shotgun shell brass caps, four .22-caliber shell casings, and three shotgun pellets.

The Petitioner gave a statement to Special Agent Mason in which he generally recounted the evening's events but omitted any mention of shooting the victim or shooting into the house. The Petitioner included that three weeks previously, his .410 sawed-off shotgun and .22 caliber pistol, a box of bullets for each firearm, and two ounces of marijuana were stolen from his house. He had no explanation for the victim's insurance card being in his fire pit. He averred that the last time he had used the fire pit was two or three weeks previously and that he had burned shell casings in the past.

Special Agent Mason collected the victim's clothing and a blood sample from the medical examiner and took them to the TBI crime laboratory. Special Agent Mason later took multiple statements from Mr. Estes and Mr. Blair, and he noted that both men's final statements were "consistent with the other facts and evidence." Special Agent Mason reviewed phone records from Mr. Good and Mr. Blair and noted a phone call from Mr. Good to Mr. Blair at 12:18 a.m. on October 4, 2009, which lasted about two seconds.

Lieutenant Ricky Knight participated in the search of the Petitioner's house and was present when Mr. Estes and Mr. Blair were initially interviewed. Lieutenant Knight knew Mr. Blair from previous dealings. Lieutenant Knight stated that Mr. Blair directed them to his blood-stained clothing and that Mr. Blair gave a statement to Special Agent Mason. Lieutenant Knight noted that generally, initial statements were not the most complete and that "they don't tell you everything[.]"

Dr. John Brently Davis of Forensic Medical Management Services performed the victim's autopsy and concluded that the cause of death was multiple shotgun wounds to the head and that the manner of death was homicide. Dr. Davis noted that there were two wounds—one on the left side of the head at the ear, and the other one below that and behind the ear. The victim's left arm and chest and right hand were also injured by shotgun pellets. The wound to the left ear was a "contact wound" that had been inflicted by a gun pressed to the victim's head, causing massive damage to the skull, brain, and right eye.

TBI Special Agent Shelly Betts testified regarding collecting the crime scene evidence. She noted that there was a seven-inch shot pellet pattern on the screen door to the pool room and on the back wall of the pool room, as well as four bullet holes on the screen window and in the wall across from the window. The bullet holes on the screen contained vaporous lead residue, indicating that the firearm had been discharged from less than thirty-six inches from the screen. The bullets had "hit the wall sideways after striking an intermediate target." A rocking chair in the corner of the pool room contained a fired shotgun shell wad and a small amount of blood. The TBI collected samples of the blood stain, a tire impression, a portion of the wall showing the shot pattern and another with the bullet holes, cigarette butts, .22-caliber bullets from the wall opposite the window and the adjoining room, and "reference ammunition" from the house. Agent Betts noted "shot patterns" in the victim's sweatshirt and t-shirt and concluded that "at a minimum, the victim experienced a close contact shotgun blast around his left shoulder area and that he had been shot once around the elbow." The shotgun shell wadding from Mr. Good's backyard, the wadding from the pool room chair and the pool room floor, and the wadding and unfired shells recovered at the Petitioner's house were all consistent with a Winchester .410-caliber firearm. Agent Betts testified that all of the shotgun shell casings from Mr. Good's backyard and "all but one" of the casings from the Petitioner's house were fired by the same gun. Agent Betts stated that two .22-caliber firearms were involved in this case, one being a .22-caliber rifle recovered at the crime scene.

Former TBI Agent Lauralee Staples collected blood from the Petitioner's car's steering wheel, and she found the victim's driver's license in the backseat floorboard of the Petitioner's car. Former TBI Agent Patrick Ihrie testified that he tested the blood sample from the Petitioner's car and concluded that it matched the victim's DNA.

*Adams*, 2019 WL 6999719, at *1–6 (internal citations and footnote omitted).

### III. CLAIMS

Petitioner asserts that trial counsel was ineffective by failing to: (1) present a cohesive

defense theory; (2) properly investigate the case; (3) perform quality pretrial interviews; (4) make

7

him aware of the evidence; (5) object to the trial court's ex parte communications with the jury during deliberations; and (6) properly advise him regarding testifying. (Doc. No. 1 at 16–17).

## IV. LEGAL STANDARD

Federal habeas relief for state prisoners is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). AEDPA sets a very high bar for granting federal relief on claims "adjudicated on the merits" in state court. *Harrington v. Richter*, 562 U.S. 86, 97 (2011). Such a claim cannot be the basis for relief unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under Section 2254(d)(1), a state court's decision is "contrary to" clearly established federal law if it either "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a [different result]." *Hill v. Curtin*, 792 F.3d 670, 676 (6th Cir. 2015) (en banc) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)). "Under the 'unreasonable application' clause of [Section] 2254(d)(1), habeas relief is available if 'the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008)). An "incorrect or erroneous" application is not enough; instead, the federal court must find that the state court's application was "objectively unreasonable." *Id.* (quoting *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003)).

To grant relief under Section 2254(d)(2), a federal court must find that "the state court's factual determination was 'objectively unreasonable' in light of the evidence presented in the state

court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). State court factual determinations are unreasonable only "if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017) (quoting *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007)). "[I]t is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011) (citing *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011)).

## V. ANALYSIS

Petitioner asserts that trial counsel was ineffective in six ways. The TCCA adjudicated each of these claims on the merits when it affirmed the denial of post-conviction relief.[3] In doing so, the TCCA applied the clearly established federal law governing ineffective-assistance-of-counsel claims, as set out in *Strickland v. Washington*, 466 U.S. 668 (1984). *Adams*, 2019 WL 6999719, at *21–22. So the TCCA's rulings are reviewed with AEDPA deference. 28 U.S.C. § 2254(d).

Under *Strickland*, a petitioner must show (1) deficient performance and (2) prejudice to the defendant. *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (citing *Strickland*, 466 U.S. at 687). Counsel's performance is deficient where it falls "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689 (citing *Michel*

---

[3]     Respondent contends that Petitioner's third assertion of ineffective assistance (regarding the quality of counsel's pretrial interviews) was not raised on post-conviction appeal and is therefore procedurally defaulted. (Doc. No. 7 at 27–29). The Court disagrees. Petitioner included this issue in his appellate brief (*see* Doc. No. 6-20 at 4, 36), and the TCCA specifically noted this issue before affirming the denial of post-conviction relief. *See Adams*, 2019 WL 6999719, at *21–24. The Court considers this an adjudication on the merits for AEDPA purposes. *See Harrington*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

*v. Louisiana*, 350 U.S. 91, 101 (1955)). Prejudice "is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. And where, as is the case here, a federal habeas court is reviewing a claim of ineffective assistance with AEDPA deference, "[t]he pivotal question" is not "whether defense counsel's performance fell below *Strickland*'s standard," but "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101. This amounts to a "'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)).

## A. Presenting a Cohesive Defense Theory

Mr. Blair and Mr. Estes each testified that he witnessed Petitioner shoot the victim (or shoot *toward* the victim) twice with a shotgun. The doctor who performed the victim's autopsy testified that "the cause of death was multiple shotgun wounds to the head." *Adams*, 2019 WL 6999719, at *5.

Petitioner asserts that counsel was ineffective for failing to pursue the defense theory that Petitioner was innocent because he was not with Mr. Blair and Mr. Estes when the victim was shot. (Doc. No. 1 at 16). The TCCA rejected this claim as follows:

> The [post-conviction] court found that trial counsel and the investigators[4] met with one another and the Petitioner to discuss the evidence and develop a defense strategy. Counsel testified that the strategy was to mirror the Petitioner's police statement, which asserted that the co-defendants committed the offenses and that he was not present. The Petitioner felt strongly about maintaining his innocence. The post-conviction court found that the defense theory was reasonable and that "trial counsel did his best to advance this theory before the jury."
>
> The record reflects that the defense theory was developed during lengthy meetings with the Petitioner in jail. At trial, counsel attempted to cast doubt on the Petitioner's involvement in the crime by cross-examination of the co-defendants, particularly regarding their inconsistent statements, and counsel argued the

---

[4] Two investigators assisted counsel with his investigation of the case: Edward Mason and Malcolm Crawford. *Adams*, 2019 WL 6999719, at *15.

Petitioner's innocence to the jury using the co-defendants' statements, the Petitioner's statement, and the Petitioner's consistent cooperation with the police.

We disagree with the Petitioner that a defense theory premised upon the Petitioner's innocence is "incoherent," and the Petitioner has provided no evidence to suggest this theory was unreasonable. Instead, his argument centers on the proposition that counsel failed to find unspecified further evidence to support his innocence. The evidence does not preponderate against the post-conviction court's finding that the defense theory was reasonable and that counsel did his best to advance the defense theory. Counsel provided effective assistance in developing and advancing the defense theory, and the Petitioner is not entitled to relief on this basis.

*Adams*, 2019 WL 6999719, at *22–23.

This ruling was reasonable. As the TCCA pointed out, counsel pursued the strategy that Petitioner says counsel should have pursued: attempting to undermine the testimony of Mr. Blair and Mr. Estes that Petitioner shot the victim. Counsel attacked Blair and Estes's credibility on this point on cross-examination by emphasizing the inconsistencies in their statements to police (Doc. No. 6-3 at 34–37, 40–45, 55 (Blair); *id.* at 98, 109 (Estes); *id.* at 195–96 (Special Agent Chet Mason)) and soliciting testimony of their impairment from very heavy drug and alcohol use on the night of the victim's death. (Doc. No. 6-3 at 37–39, 42–44 (Blair); *id.* at 97, 111 (Estes)). Counsel continued pursuing Petitioner's preferred defense theory during closing argument, including by pointing to a lack of forensic evidence and arguing that the State had not "put anything out there that shows that [Petitioner] was actually at that scene." (Doc. No. 6-4 at 130–31). This defense theory may have been unsuccessful, but counsel was not ineffective for failing to pursue it. So it was reasonable for the TCCA to reject Petitioner's claim to the contrary.

**B. Investigating the Case**

Petitioner next asserts that counsel failed to properly investigate the case, arguing that further investigation would have led to the discovery of "forensic and circumstantial evidence . . .

11

point[ing] to [Mr. Blair and Mr. Estes] as the shooters." (Doc. No. 1 at 16). The TCCA rejected

this claim on both deficiency and prejudice grounds:

> Relative to investigation, the post-conviction court accredited the testimony of trial counsel, Mr. Mason, and Mr. Crawford that they met "extensively" with one another and the Petitioner to identify potential issues. Counsel and the investigators "investigated the potential issues in great detail," and counsel "thorough[ly]" cross-examined the State's witnesses on these issues. The court found that counsel's "effective handling" of the issues at trial established that his investigation prepared him to defend the Petitioner.

> The record reflects that trial counsel, Mr. Mason, and Mr. Crawford testified at length regarding their efforts in investigating this case, including the investigators' documented ninety-seven hours of work and counsel's twenty-four jail visits with the Petitioner. Counsel, Mr. Mason, and Mr. Crawford all attempted to interview as many witnesses as were identified, but some witnesses could not be located or refused to speak with them. Mr. Mason attempted to examine the crime scene multiple times and was eventually denied entry. Counsel, Mr. Mason, and Mr. Crawford similarly reviewed all the discovery materials to look for gaps, and they met with the prosecutor's office to review the full file, ask questions, and fill those gaps. The Petitioner was also provided with the documents obtained during this visit. When new discovery materials were given to counsel near the time of trial, the investigators were directed to follow up on new leads and attempted unsuccessfully to contact one additional witness.

> The Petitioner has failed to establish that this case was insufficiently investigated. The unwillingness of potential witnesses to cooperate with the investigation does not establish deficiency on counsel's part. Further, the Petitioner did not introduce at the post-conviction hearing any purported evidence that counsel would have discovered during further interviews or investigation. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. 1990) ("It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel."). Counsel provided effective assistance in his investigation, and the Petitioner is not entitled to relief on this basis.

*Adams*, 2019 WL 6999719, at *23.

As an initial matter, this ruling was reasonable because Sixth Circuit law supports the

proposition, relied on by the TCCA, that "[a] petitioner cannot show deficient performance or

prejudice resulting from a failure to investigate if the petitioner does not make some showing of

12

what evidence counsel should have pursued and how such evidence would have been material." *Rose v. Warden Chillicothe Corr. Inst.*, No. 18-3997, 2019 WL 5260158, at *4 (6th Cir. July 17, 2019) (quoting *Hutchison v. Bell*, 303 F.3d 720, 748 (6th Cir. 2002)). And specifically with respect to the TCCA's deficiency ruling, the TCCA credited the evidentiary hearing testimony of counsel, Investigator Mason, and Investigator Crawford describing the extensive efforts they undertook to investigate the case. This credibility finding is "entitled to great deference and must be sustained unless [it is] clearly erroneous, particularly in the context of AEDPA-limited habeas review." *Howell v. Hodge*, 710 F.3d 381, 386 (6th Cir. 2013) (internal citations and quotation marks omitted). Petitioner has not demonstrated that this credibility finding was clearly erroneous. And although Petitioner claims, in a conclusory manner, that additional investigation would have developed unspecified "forensic and circumstantial evidence" implicating Mr. Blair and Mr. Estes, he has not pointed to any particular avenue of investigation that went unexplored after he asked counsel to pursue it. Counsel, moreover, *did* point to forensic and circumstantial evidence implicating Blair and Estes at trial, but the jury convicted Petitioner regardless. The TCCA, accordingly, reasonably rejected Petitioner's claim that counsel's investigation was ineffective.

## C. Performing Quality Interviews

Petitioner asserts that counsel failed to perform "quality" pretrial interviews of himself, Mr. Blair, and Mr. Estes. (Doc. No. 1 at 16). If counsel had conducted proper interviews of these witnesses, Petitioner argues, then counsel "would have been able to produce evidence and testimony exonerating Petitioner." (*Id.*). The TCCA rejected this claim alongside Petitioner's failure-to-investigate claim. It ruled, as a general matter, that Petitioner could not prevail on a failure-to-interview claim because Petitioner did not present at the evidentiary hearing "any purported evidence that counsel would have discovered during further interviews." Similarly, with

13

respect to Petitioner specifically, the TCCA ruled that he "gave no evidence of information in his possession that might have been obtained had counsel spent more time interviewing him." *Adams*, 2019 WL 6999719, at *23 (citing *Black*, 794 S.W.2d at 757). As noted above, this rationale provides a reasonable basis to reject a claim of ineffective assistance. *See Rose*, 2019 WL 5260158, at *4 (citing *Hutchison*, 303 F.3d at 748). So this claim will be denied.

**D. Discussing Discovery**

Next, Petitioner asserts that counsel failed to "discuss the inculpatory and exculpatory evidence in the case with him prior to the trial" and otherwise failed to communicate adequately. (Doc. No. 1 at 16–17). The TCCA rejected this claim:

> Relative to the attorney-client relationship and trial counsel's explanation of the sufficiency of the evidence, the post-conviction court found that jail visitor logs established trial counsel's "frequent[ ]" meetings with the Petitioner before trial. The court accredited counsel's testimony regarding the trial preparation and found that counsel "discussed evidence, strategy, and other salient issues . . . [and] explored all issues as instructed by [the] Petitioner. [The Petitioner's] assertion he had no meaningful attorney-client relationship with [counsel] is simply not borne out by the credible evidence presented at the post-conviction hearing and present in the trial record."

> \*   \*   \*

> The record reflects that trial counsel met with the Petitioner thirty-four times in the twenty-six months between counsel's appointment and the trial, which includes twenty-four jail visits and ten court appearances. Mr. Mason's invoice documented two interviews with the Petitioner that were multiple hours in length, the first of which was attended by counsel. The post-conviction court discredited the Petitioner's assertion that counsel visited him once every ninety days. Although the Petitioner testified that he was not able to review some unspecified pieces of evidence in discovery before the trial, his testimony was discredited. The post-conviction court accredited counsel's testimony that he provided his entire file to the Petitioner and kept the Petitioner apprised of the evidence.

> The evidence does not preponderate against the post-conviction court's finding that counsel appropriately developed an attorney-client relationship with the Petitioner during his pretrial incarceration and explained the relevant evidence to him. This finding is amply supported by the State's evidence at the post-conviction hearing. The Petitioner is not entitled to relief on this basis.

14

*Adams*, 2019 WL 6999719, at *24.

As this ruling reflects, the TCCA rejected this claim by again discounting Petitioner's credibility. Petitioner testified that counsel visited him about "once every three months" before trial, but the record reflected thirty-four pretrial meetings between Petitioner and counsel over a twenty-six-month span. *Adams*, 2019 WL 6999719, at *8, 14. Petitioner testified that counsel did not give him the full discovery file until after trial, but counsel testified that he gave petitioner the full file after Petitioner requested it. *Id.* at *10, 18. And Petitioner testified that counsel did not meaningfully explain the evidence to him, but counsel said that he reviewed the full file with Petitioner and believed that Petitioner had a good understanding of the evidence. *Id.* at *8, 18. The TCCA credited counsel's side of this testimony, and Petitioner has not shown this credibility finding to be clearly erroneous, so this Court must credit counsel as well. *See Howell*, 710 F.3d at 386. When doing so, it was clearly reasonable for the TCCA to conclude that counsel provided effective assistance in explaining the evidence to Petitioner before trial.

**E. Objecting the Ex Parte Communications**

During jury deliberations, the jury submitted questions to the court on two separate occasions. The first question asked whether a finding of guilt for the three charged offenses (first-degree felony murder, second degree murder, and especially aggravated robbery) would mean that "no lesser offenses are included." (Doc. No. 6-8 at 61). The court convened the parties outside the presence of the jury, read the question, and remarked:

> Of course, the answer is, that's correct. So, I'm going to give you gentlemen an option. I can go back there and tell them that it's clearly in the instructions that if they reach a unanimous verdict on the indicted count, which is in there, then they don't consider any lesser, or if you prefer, I'll bring them out here and give them the answer. But I'm just going to tell them what the instruction is all over again.

15

(*Id.* at 196–97). Counsel for the State and Petitioner then responded on the record that the court could go to the jury room to deliver the agreed-upon instruction. (*Id.* at 197).

The second question concerned the elements of first-degree felony murder. This count of the indictment charged Petitioner with killing the victim "during the perpetration of or attempt to perpetrate a robbery." (Doc. No. 6-1 at 5). The court had instructed the jury that a finding of guilt for this offense required a finding that Petitioner "intended to commit the alleged robbery," and that the essential elements comprising robbery included, among other things, a finding that Petitioner took property owned by another "by the use of violence or putting the person in fear." (Doc. No. 6-4 at 161–62). In its second question, the jury asked whether a finding of guilt for first-degree felony murder required a finding that Petitioner was "the person" who "took such property from the person of another by the use of violence or putting the person in fear." (Doc. No. 6-8 at 62). The court again convened the parties outside the jury's presence, read the question, and stated: "Of course, I think the correct answer is, under criminal responsibility, the answer is, no, that it had to be either [Petitioner] or someone [for whom] he was criminally responsible." (Doc. No. 6-4 at 197–98). Counsel for the State and Petitioner agreed and told the court that he could deliver this answer to the jurors in the jury room rather than bringing them into open court. (*Id.* at 198).

Petitioner asserts that counsel was ineffective for failing to object to these ex parte communications between the trial court and the jury. (Doc. No. 1 at 17). In rejecting this claim, the TCCA emphasized that Tennessee trial courts in these circumstances "should discontinue the practice of communicating ex parte with deliberating juries." *Adams*, 2019 WL 6999719, at *25 (collecting cases). And because counsel did not attempt to "articulate a tactical reason for agreeing to an inappropriate procedure," the TCCA found counsel to be "deficient in this regard." *Id.* at

*26. Nonetheless, the TCCA found that it had no basis to presume prejudice for this claim, and

that Petitioner had not otherwise demonstrated it:

> In this case, we are presented with the issue in the context of ineffective assistance of counsel . . . . The burden in a post-conviction proceeding is on the Petitioner to prove the allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); *see Dellinger* [*v. State*], 279 S.W.3d [282,] 293–94 [Tenn. 2009]. Simply put, the Petitioner must establish that, but for trial counsel's deficiency in agreeing to the trial court's improper actions and not preserving the issue for appeal, (1) the jury's verdict would have been different, or (2) this issue would have been successfully litigated on appeal.[5]
>
> Relative to the effect of the communication on the jury's verdict, although this court correctly discussed in [*State v.*] *Barish*[, No. E2012-01353-CCA-R3-CD, 2013 WL 5436909, at *19 (Tenn. Crim. App. Sept. 27, 2013),] that "proof of an improper influence creates a presumption of prejudice," we do not think *Barish* creates a rule that the mere existence of an ex parte communication from a trial court during deliberations triggers the presumption of prejudice. That is to say, the influential nature of the communication must be evident from the record.
>
> To be clear, this type of ex parte communication during deliberations is highly inappropriate, and we caution judges against utilizing such a procedure. Jury questions, problems with the legality of the verdict, and any similar issues should be addressed on the record in open court and in the presence of the parties, accompanied by limiting instructions regarding the weight given to any supplemental jury instructions. *See State v. Bowers*, 77 S.W.3d 776, 791 (Tenn. Crim. App. 2001). However, we decline to presume prejudice from every ex parte communication between a judge and jury, and we will examine the unique facts of this case to determine whether there was a reasonable possibility that the ex parte communication influenced the jury's verdict to the Petitioner's prejudice.
>
> This case is distinguishable from *Barish* in that the influential nature of the trial court's communication is not apparent from the record. In *Barish*, the jury changed

---

[5]     This framing of the *Strickland* prejudice standard may be read to reflect a misstatement of the law, in that it omits "reasonable probability" language. But the TCCA correctly described *Strickland* prejudice both at the outset of its analysis, *see Adams*, 2019 WL 6999719, *22, and elsewhere in its discussion of this particular claim. See id. at *28 (noting that it would "examine the unique facts of this case to determine whether there was a reasonable possibility that the ex parte communication influenced the jury's verdict to the Petitioner's prejudice"). So, reading the opinion as a whole and giving the state court the benefit of the doubt, as required when reviewing a claim with AEDPA deference, the TCCA did not commit legal error by applying an incorrect standard in its resolution of this claim. *See Johnson v. Genovese*, 924 F.3d 929, 937 n.2 (6th Cir. 2019) (citing *Woodford v. Visciotti*, 537 U.S. 19, 23–24 (2002) (noting that, despite examples of a state court opinion's arguably loose language describing *Strickland* prejudice, correct statements of the standard elsewhere in the opinion "inoculate[]" the state court "against concerns that it did not know or apply clearly established federal law")).

its verdict from second-degree murder to first-degree murder only a few minutes after the ex parte communication, before which it had deliberated for nine and one-half hours. In this case, the record does not reflect how long the jury deliberated before or after each of the two questions were answered, but the verdict was only issued once and did not change. In addition, unlike the trial court in *Barish*, the trial court in this case reviewed with the parties what it intended to convey to the jury and obtained their consent before communicating with the jury.

The Petitioner did not call as witnesses the trial judge, who had recused himself from the post-conviction proceedings and would have been able to testify, or any of the jurors. As a result, we do not have a record of what the jury was told other than the court's otherwise proper proposed instructions. Trial counsel testified that he did not know that any improper commentary by the court occurred and that his experience with the court was that the court adhered to the pattern jury instructions. Without establishing that the trial court deviated from its proposed instructions, the Petitioner has not proven by clear and convincing evidence that the court improperly influenced the jury. As a result, the Petitioner has not demonstrated that the communications affected the jury's verdict.

Relative to the viability of the issue on appeal, if counsel had objected to the ex parte communication, a presumption of prejudice would not have necessarily attached on appeal and would have depended on this court's assessment of the adequacy of the record. At most, this court could have remanded for a hearing for more findings of fact, but the facts of the Petitioner's case, standing alone, do not have the indicia of improper influence such that a presumption of prejudice would have applied. As stated above, the Petitioner did not present evidence at the post-conviction hearing establishing that influential comments were made to the jury. The Petitioner has not proven by clear and convincing evidence that he would have been entitled to a new trial if the issue had been properly preserved. Consequently, although trial counsel was deficient for failing to request that the jury be brought in for the supplemental instructions, the Petitioner has not proven that the issue would have been successful on appeal. The Petitioner is not entitled to relief on this basis.

*Adams*, 2019 WL 6999719, at *28.

Applying AEDPA deference, this ruling was not unreasonable. Federal law supports the proposition that a court cannot presume prejudice from the mere fact of an ex parte communication between a trial court and the jury during jury deliberations. *See United States v. Paul*, 57 F. App'x 597, 604 (6th Cir. 2003) (citing *Rushen v. Spain*, 464 U.S. 114, 118–19 (1983) ("[E]ven if a judge improperly participates in ex parte communications [with the jury], such communications will not necessarily constitute reversible error. There must be a reasonable possibility that the ex parte

18

communications affected the verdict.")); *Rushen*, 464 U.S. at 119 (footnote omitted) ("When an ex parte communication [between judge and juror] relates to some aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties."). And Petitioner did not present any evidence regarding the contents of the trial court's ex parte communications at the evidentiary hearing. This, as the Court has noted above, provided a reasonable basis for the TCCA to conclude that Petitioner failed to demonstrate prejudice in this regard. *See Hutchison*, 303 F.3d at 748. Accordingly, Petitioner's claim that counsel was ineffective for failing to object to the trial court's ex parte communications with the jury will be denied.

## F. Advising Petitioner Not to Testify

Finally, Petitioner asserts that counsel failed to properly advise him on the decision of whether to testify at trial, going so far as to allege that he "wanted to testify" but counsel "coerced him not to." (Doc. No. 1 at 17). The TCCA rejected this claim as follows:

> The post-conviction court accredited trial counsel's testimony that he and the Petitioner discussed the Petitioner's potential testimony "extensively up to the moment of trial [when the] Petitioner made his decision." The court found that counsel "gave [the] Petitioner well-reasoned advice not to testify" and that the Petitioner chose not to testify after being "fully informed" of his rights and the potential consequences of testifying. The court also discredited the Petitioner's testimony that he was not fully informed.

> The record reflects that trial counsel and the Petitioner discussed the possibility of his testifying multiple times and that counsel informed the Petitioner that he would have to be consistent with his police statement in order for the testimony to be helpful. Likewise, the Petitioner was informed that he would be subject to cross-examination and that any inconsistencies in his story could damage his case. The Petitioner was further aware that the jury would have access to his written statement, in which he claimed his innocence. The Petitioner reviewed his version of events with counsel and the investigators multiple times before trial in the event he chose to testify. Our review of the *Momon* hearing[6] reflects that the Petitioner affirmed to the trial court that he had been adequately informed of his rights and that he chose not to testify of his own volition. The evidence does not preponderate

---

[6] The TCCA described a *Momon* hearing as "the prophylactic procedure outlined in *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999), which is designed to ensure that a defendant's waiver of his right to testify is voluntary, knowing, and intelligent." *Adams*, 2019 WL 6999719, at *9 n.4.

19

against the post-conviction court's finding that counsel provided effective assistance in this regard. The Petitioner is not entitled to relief on this basis.

*Adams*, 2019 WL 6999719, at *24.

This ruling was clearly reasonable. After the State rested its case at trial, the trial court questioned Petitioner under oath regarding his right to testify. The court asked Petitioner if he understood that he had an "absolute right to testify," if counsel had "discuss[ed] both the advantages and disadvantages of testifying and . . . not testifying," and if, "after having these discussions[, he had] made a decision." (Doc. No. 6-4 at 109–10). "Yes, sir," Petitioner testified. "I don't want to testify." (*Id.*). This sworn testimony carries a strong presumption of truthfulness in subsequent proceedings. *See Cummins v. Phillips*, No. 1:16-cv-00023, 2017 WL 6554889, at *18 (M.D. Tenn. Dec. 22, 2017) (citing *Blackledge v. Allison*, 431 U.S. 63, 74 (1977) (rejecting habeas petitioner's claim that counsel improperly influenced him not to testify based, in part, on petitioner's testimony during *Momon* hearing)). Although Petitioner asserts that counsel did not prepare him to testify, the TCCA discredited his evidentiary hearing testimony to that effect. The Court accepts this credibility finding because Petitioner has not shown it to be clearly erroneous. *See Howell*, 710 F.3d at 386. It was therefore reasonable for the TCCA to conclude that counsel was not ineffective for advising Petitioner not to testify.

## VI. CONCLUSION

For these reasons, Petitioner is not entitled to relief under Section 2254 and this case will be **DISMISSED**.

Petitioner cannot appeal this adverse ruling without a certificate of appealability (COA). Habeas Rule 11(a). A COA requires "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could

conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

For the reasons stated throughout the Court's analysis, the Court concludes that Petitioner has not satisfied this standard and will **DENY** a COA.

An appropriate Order shall enter.

WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE